MT. CLEMENS FIRE FIGHTERS UNION, LOCAL 838, IAFF v CITY
OF MT. CLEMENS

1. LABOR RELATIONS—MUNICIPAL CORPORATIONS—PENSIONS—RETIRE-
   MENT BENEFITS—VESTED CONTRACT RIGHTS—COLLECTIVE BAR-
   GAINING—EMPLOYMENT RELATIONS COMMISSION.

   Pension and retirement benefits provided by a city for its em-
   ployees are contractually vested rights which constitute a
   valuable condition of employment, any changes in which are
   mandatory subjects of collective bargaining, reviewable by the
   Michigan Employment Relations Commission.

2. LABOR RELATIONS—MUNICIPAL CORPORATIONS—PENSIONS—HOME
   RULE CITIES ACT—SUBSTANTIVE TERMS—COLLECTIVE NEGOTIA-
   TION—PUBLIC EMPLOYMENT RELATIONS ACT.

   The home rule cities act empowers a city to set up the procedures
   for its pension plan for employees in its charter, but the
   substantive terms of the plan are subject to collective negotia-
   tion under the public employment relations act (MCLA 117.1 *et
   seq.,* 423.210).

3. LABOR RELATIONS—LEGISLATURE—COLLECTIVE BARGAINING—PUBLIC
   EMPLOYMENT RELATIONS ACT—NATIONAL LABOR RELATIONS ACT
   —EMPLOYMENT RELATIONS COMMISSION—PRECEDENTS—PUBLIC
   SECTOR BARGAINING.

   The collective bargaining section of the public employment rela-
   tions act is patterned after the similar section of the National
   Labor Relations Act with the exception that the Michigan

REFERENCES FOR POINTS IN HEADNOTES

[1] 48 Am Jur 2d, Labor and Labor Relations §§ 674, 753.
What are "wages" as to which amended National Labor Relations
Act makes collective bargaining mandatory. 3 L Ed 2d 1725.
[2, 7] 48 Am Jur 2d, Labor and Labor Relations § 688.
56 Am Jur 2d, Municipal Corporations, Counties, and Other Politi-
cal Subdivisions § 125.
60 Am Jur 2d, Pensions and Retirement Funds § 41.
[3] 48 Am Jur 2d, Labor and Labor Relations § 1191 et seq.
[4, 5] 48 Am Jur 2d, Labor and Labor Relations §§ 276, 425–428, 1246–
1257, 1401.
[6] 48 Am Jur 2d, Labor and Labor Relations §§ 1295, 1296.

Employment Relations Commission will rely on the legal precedents already developed under the national act to the extent that they apply to public sector bargaining (MCLA 423.215; 29 USC 158d).

4. ARBITRATION AND AWARD—ARBITRATION CLAUSES—INTERPRETATION.

An order to arbitrate a particular grievance under a standard arbitration clause should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

5. LABOR RELATIONS—ARBITRATION AND AWARD—LABOR CONTRACTS—EXPRESS PROVISIONS—EVIDENCE OF PURPOSE.

The parties to a labor contract may choose to exclude certain areas of contention from the arbitration process, but to do so there must be either an express provision excluding a particular grievance from arbitration or the most forceful evidence of a purpose to exclude the claim from arbitration.

6. LABOR RELATIONS—COURTS—NATIONAL LABOR RELATIONS BOARD—EMPLOYMENT RELATIONS COMMISSION—CONCURRENT JURISDICTION—PROSCRIBING CONDUCT—UNFAIR PRACTICES—BREACH OF CONTRACT.

The National Labor Relations Board (NLRB), Michigan Employment Relations Commission (MERC), and the courts have concurrent jurisdiction over labor disputes based on contract, and while arbitrators and courts are still the principal sources of contract interpretation, the NLRB and MERC may proscribe conduct which is an unfair labor practice even though it is also a breach of contract remediable as such by arbitration and in the courts.

7. LABOR RELATIONS—MUNICIPAL CORPORATIONS—PENSIONS AND RETIREMENT—CHARTER—COLLECTIVE BARGAINING.

A city charter's provisions for paying pension and retirement benefits to its employees cannot prevent the setting of such benefits through collective bargaining between a city and its employees.

Appeal from the Employment Relations Commission. Submitted Division 2 December 2, 1974, at Lansing. (Docket No. 20015.) Decided February 13, 1975.

Complaint by the Mount Clements Fire Fighters Union, Local 838, I. A. F. F., against the City of Mount Clemens before the Employment Relations Commission alleging unfair labor practices. Defendant appeals the Commission's decision and order in favor of plaintiff. Affirmed.

*Marston, Sachs, O'Connell, Nunn & Freid, P. C.* (by *Ronald R. Helveston* and *Charles Looman),* for Mount Clemens Fire Fighters Union.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Francis W. Edwards,* Assistant Attorney General, for Michigan Employment Relations Commission.

*Daner, Freeman, McKenzie & Matthews, P. C.* (by *Kenneth E. Scherer),* for City of Mount Clemens.

Before: D. E. HOLBROOK, P. J., and R. B. BURNS and VAN VALKENBURG,* JJ.

D. E. HOLBROOK, P. J. This is an appeal from a decision of the Michigan Employment Relations Commission (hereinafter called MERC) ordering the defendant City of Mt. Clemens (hereinafter called city) to cease and desist from refusing to bargain with the Mt. Clemens Fire Fighters Union, Local 838, I.A.F.F. (hereinafter called union) and to submit the subject grievance dispute to arbitration.

The city charter of the City of Mt. Clemens provided for a retirement program for certain classes of employees including the member firemen of the plaintiff union.

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

Both 1972 and 1973 collective bargaining agreements, between the city and union, grant members of the fire department a certain number of sick-leave days for each year of employment. Unused sick-leave days are permitted to accumulate for a maximum of 94 work days, in the case of those employed in fire fighting positions, and 150 days for those in fire-prevention positions.

The Mt. Clemens City Charter contains a provision dealing with an employees' retirement system, which is applicable to members of the fire department, as well as other city employees. However, certain specific provisions are applicable only to fire fighting personnel, and not to other employees of the city.

Under the terms of the charter, pension payments made upon death or retirement are based upon the employee's "final average compensation". This is defined as the average of the highest annual compensation received by a member during a period of five consecutive years of credited service.

Since the inception of the pension system, the city pursued a policy and practice of including the sick-leave payment paid to the retiring employee in the computation of his pension, without limitation as to the time when the unused and accumulated sick leave actually was earned and accrued. The sick-leave payment, for computation purposes, was generally allocated to the last year of service, rather than to the year in which it was earned and accrued.

In August of 1972 the retirement board requested an opinion from its legal advisor as to whether payments for unused and unpaid sick leave are properly includable in the computation of the "final average compensation" for purposes of establishing pension benefits for retiring city

employees. It also inquired as to the proper method of the allocation of such payments.

On August 1, 1972, the city attorney advised the board that compensation paid for accumulated and unused sick leave is in the nature of "salary or wages" and a factor to be included in the computation of "final average compensation". He advised, however, that the computation should include only that portion of the unpaid and accumulated sick leave which was actually accrued and earned in the last five years of employment. He regarded unused and accumulated sick leave, for computation purposes, as allocable only to the years in which it was earned and accrued.

The city attorney cautioned that his conclusion was not based upon any Supreme Court decisions or precedent and that, if the board followed the same, it could expect a great deal of litigation. He advised: "Further, the retirement system is a charter provision, and in order to clearly spell out this limitation, it would take a charter amendment."

The board, notwithstanding the qualifications and the admonitions expressed in the city attorney's opinion on May 22, 1973, adopted the subject resolution. It changed the method of computing final compensation for retirement purposes by excluding all payments with respect to sick leave which were earned and accumulated prior to the fifth year preceding retirement. Thereupon Clifford Fanning, a member of plaintiff union, and the union through its president and vice-president filed a grievance,[1] which the city rejected. Thereaf-

---

[1] "On or about May 22, 1973, the City of Mt. Clemens acting through the Retirement Board of Trustees, unilaterally changed the method of computing employees' 'Final Average Compensation' for the firefighters retirement system. The Mt. Clemens Fire Fighters Union, Local 838, pursuant to Article XVIII of the collective bargaining agreement, hereby notifies the city that this unilateral change in terms and conditions of employment violates the collective bargaining agreement, *inter alia,* Article XV, Maintenance of Conditions."

ter the union requested the grievance be submitted to arbitration and the city again refused on the ground that it did not involve a "grievable" item, and refused to submit the claimed grievance to arbitration.

Thereafter a charge and amended charge were filed with the MERC under the public employment relations act, 423.201 *et seq.;* MSA 17.455(1) *et seq.* (hereinafter referred to as PERA). The union charged that the city committed unfair labor practices when it unilaterally changed a condition of employment and refused to submit the ensuing grievance to arbitration under the collective bargaining agreement.

The subject grievance is based on the violation of article XV of the collective bargaining agreement which in pertinent part reads as follows:

"*Section 1. Maintenance of Conditions.* Wages, hours, and conditions of employment in effect at the execution of this Agreement shall, except as improved herein, be maintained during the term of this Agreement. No employee shall suffer a reduction in benefits as a consequence of the execution of this Agreement.

"*Section 2. Unilateral Changes Prohibited.* The city will make no unilateral changes in wages, hours, or working conditions or conditions of employment during the term of this Agreement, either contrary to the provisions of this Agreement or otherwise."

In article XVIII, Grievance and Arbitration Procedure, it is provided in pertinent part:

"It is mutually agreed that all grievances, disputes or other complaints arising under and during the term of this Agreement shall be settled in accordance with the procedure hereinafter outlined. Every effort shall be made to adjust controversies and disagreements in an amicable manner between the employer and the union.

In the event any grievance cannot be settled in this manner, the question may be submitted by either party for arbitration as hereinafter provided: * * *

*"Step 3.* In the event the grievance remains unresolved after completion of Step 2 of the grievance procedure, such grievance may be appealed to arbitration by either the union or the city. It is intended herein to prevent an appeal by an individual employee without the consent of the union. Notice of such appeal shall be given to the city manager, or his designated representative, within seven (7) days of the completion of Step 2. The parties hereto agree to select the arbitrator in the following manner;

"The party requesting arbitration shall promptly thereafter file a demand for arbitration with the American Arbitration Association in accordance with the then applicable rules and regulations of said American Arbitration Association, sending a copy of such demand to the opposite party; provided that the American Arbitration Association shall be advised that no employee of the State or Federal Government, or any subdivision thereof, other than educational institutions, may be used as an arbitrator under this Agreement.

"The arbitrator shall have the authority and jurisdiction to determine the interpretation and/or application of the collective bargaining agreement respecting the grievance in question, but he shall not have the power to alter or modify the terms of this Agreement.

"Said arbitration shall be conducted under the auspices of the American Arbitration Association, and the conduct of said hearing shall be controlled by the rules of the Association. The fees of the American Arbitration Association and the fees and expenses of the arbitrator shall be paid one-half (1/2) by the union and one-half (1/2) by the employer, and all other expenses shall be borne by the party incurring them.

"So long as said arbitrator does not exceed his authority as provided herein, his decision shall be final and binding on the union, and all members of the bargaining unit, and the employer. The union will discourage any attempt by its members and will not encourage or cooperate with any of its members, in any

appeal to any court or labor board from the decision of the arbitrator."

On April 4, 1974 MERC, pursuant to MCLA 423.2 *et seq.;* MSA 17.454(2) *et seq.,* issued a decision finding that the city had committed unfair labor practices, both under the provisions of PERA, MCLA 423.210(e); MSA 17.455(10)(e), and the collective bargaining agreement. It ordered, among other things, that the city cease and desist from refusing to bargain with the union, that the grievance was arguably arbitrable, and ordered the city to submit the dispute to arbitration, in accordance with the terms of the collective bargaining agreement. The city has appealed from that decision and order.

The three issues raised by the respondent city are reworded herein and are dealt with in proper order.

I

Is the claimed grievance a labor dispute or a "grievable" item under statute and the terms of the collective bargaining agreement?

Section 10(e) of PERA, MCLA 423.210(e); MSA 17.455(10)(e), required the city to bargain collectively with the representatives of its public employees. The city refused to bargain with the union on the claimed grievance. On this subject we turn to the recent important case of *Detroit Police Officers Association v City of Detroit,* 391 Mich 44, 63; 214 NW2d 803, 813 (1974), wherein Mr. Justice SWAINSON, speaking for the Court, said: "We summarily find that MERC was correct in holding that changes in the police retirement plan are manda-

tory subjects of bargaining."[2] We do not visualize that under the facts in the present case the order of MERC in enforcing the provisions of PERA, will conflict with the provisions of the Mt. Clemens City Charter. However, should a conflict be present this problem is solved also by the case of *Detroit Police Officers Association, supra,* wherein on pp 67–68; 214 NW2d at 815, it is stated in part as follows:

"To summarize, the home rule cities act does not require that the substantive terms of pension plans be voter approved. In this important respect it does not conflict with PERA. The home rule cities act and PERA can be easily harmonized by reading the home rule cities act to empower a city to set up the procedures for its pension plan in the charter and to leave the substantive terms of the plan to collective negotiation. We therefore follow the most basic tenet of statutory construction and construe these two independent acts of the Legislature to be consistent with each other."

The grievance was founded on the claimed violation by the city of its agreement contained in article XV, *viz:* "The city will make no unilateral changes in wages, hours, or working conditions or conditions of employment during the term of this agreement, either contrary to the provisions of this agreement or *otherwise."* (Emphasis supplied.) The rights of the members of the union under the pension and retirement plan of the city as it was administered at the time of the contract was a valuable part of the conditions of employment. This is recognized in our fundamental law as provided for in Const 1963, art 9, § 24, which states in part: "The accrued financial benefits of

---

[2] *Inland Steel Co v NLRB,* 77 NLRB 1; 21 LRRM 1310, enforced 170 F2d 247 (CA 7, 1948), cert den 336 US 960; 69 S Ct 887; 93 L Ed 1112 (1949).

each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." The benefits provided by the city for its employees pertaining to pension and retirement are contractual and therefore become vested rights. The formula used by the city for many years in determining benefits to be paid thereunder is claimed to have been changed by the city unilaterally at a time when the collective bargaining agreement was viable. The city in refusing to bargain with the union on the subject of changes in the retirement plan of the city as required under MCLA 423.210(e); MSA 17.455(10)(e), resulted in a bona fide labor dispute.

We are constrained to rule that the subject grievance is a "grievable" item.

## II

Is the Michigan Employment Relations Commission the proper forum for determining whether the collective bargaining agreement between the city and the union requires arbitration to settle the dispute?

The city asserts that (1) there is no specific mention in the collective bargaining agreement of the pension and retirement plan, and it was not the intention of the parties to submit to arbitration the subject controversy; and (2) in the absence of a statute specifically making a breach of a collective bargaining agreement an unfair labor practice, the courts are the proper forum for determining whether or not a labor dispute is arbitrable.

The authority for the jurisdiction of MERC in this matter is based upon claimed violation of § 10

of PERA; MCLA 423.210(e); MSA 17.455(10)(e): "It shall be unlawful for a public employer or an officer or agent of a public employer * * * (e) to refuse to bargain collectively with the representatives of its public employees * * * ." The city refused to bargain on the issue and also refused to submit the same to arbitration when the union requested it. We have previously ruled that police pension and retirement plans are mandatory subjects of bargaining. We rule that the benefits to be paid under a pension and retirement plan as enjoyed by the firemen belonging to the plaintiff union herein, constituted a valuable condition of employment. A change in remuneration to plaintiff via a change in the retirement plan constitutes a change in conditions of employment, and we rule MERC had jurisdiction to consider the actions of defendant city as constituting an unfair labor practice under section 10 of PERA. The fact that the collective bargaining agreement did not specifically mention benefits to be paid under the pension and retirement plan of the city does not in the least eliminate such benefits from being included in the clause requiring the city to maintain the conditions of employment during the life of the agreement.

Defendant further claims that the courts are the appropriate forum to determine if a labor dispute is arbitrable. Our PERA was patterned after the National Labor Relations Act (hereinafter called NLRA), and we look to the interpretation of that law by the Federal courts as a guide in our construction of PERA. In *Detroit Police Officers Association v City of Detroit,* 391 Mich 44, 53; 214 NW2d 803, 807–808 (1974), it is stated:

"Section 15 of PERA undoubtedly was patterned after § 8(d) of the National Labor Relations Act (NLRA). Both

statutes use almost identical language in describing the duty to bargain. The decision by the Michigan Legislature to adopt the language of § 8(d) of the NLRA is significant. Section 8(d) has been a part of the NLRA since the Taft-Hartley amendments of 1947. The terms of § 8(d) have been litigated in numerous cases before the National Labor Relations Board (NLRB) and the Federal courts. Although we cannot state with certainty, it is probably safe to assume that the Michigan Legislature intentionally adopted § 15 PERA in the form that it did with the expectation that MERC and the Michigan courts would rely on the legal precedents developed under NLRA, § 8(d) to the extent that they apply to public sector bargaining. Edwards, *The Emerging Duty to Bargain in the Public Sector,* 71 Mich L Rev 885, 895 (1973)." (Footnotes omitted.)

Section 8(d) NLRA, 61 Stat 142 (1947); 29 USC 158(d), deals with collective bargaining requirements in almost identical terms as those employed in § 15, PERA. The provisions have been litigated in numerous cases before the courts, and such cases are authority for the courts in Michigan to rely upon in determining the correct interpretation to be placed on our PERA. The case of *Smith v Evening News Association,* 371 US 195; 83 S Ct 267; 9 L Ed 2d 246 (1962), involved a labor dispute commenced by a complaint in the Wayne County Circuit Court of Michigan, and was dismissed upon a motion by the defendant. It was stated therein at 371 US at 197; 83 S Ct at 268–269; 9 L Ed 2d at 249:

"In *[Teamsters, C W & H v] Lucas Flour Co,* [369 US 95; 82 S Ct 571; 7 L Ed 2d 593 (1962)] as well as in *Atkinson [v Sinclair Refining Co,* 370 US 238; 82 S Ct 1318; 8 L Ed 2d 462 (1962)], the Court expressly refused to apply the preemption doctrine of the *[San Diego Bldg Trades Council v] Garmon,* [359 US 236; 79 S Ct 773; 3 L Ed 2d 775 (1959)] case; and we likewise reject that

doctrine here where the alleged conduct of the employer, not only *arguably,* but concededly, is an unfair labor practice within the jurisdiction of the National Labor Relations Board. The authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301. If, as respondent strongly urges, there are situations in which serious problems will arise from both the courts and the Board having jurisdiction over acts which amount to an unfair labor practice, we shall face those cases when they arise." (Footnotes omitted.) (Emphasis supplied.)

As to whether the arbitration clause in the instant collective bargaining agreement includes the subject grievance, we turn to the case of *International Association of Machinists v Howmet Corp,* 466 F2d 1249, 1251–1252 (CA 9, 1972):

"The Supreme Court has established a strong presumption in favor of arbitration as the preferred method of settlement of industrial disputes. When the standard form of arbitration clause is used in a collective bargaining agreement, as it was here, 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage'. *United Steelworkers of America v Warrior & Gulf Co,* 363 US 574, 582–583; 80 S Ct 1347, 1353; 4 L Ed 2d 1409 (1960). See also *United Steelworkers of America v American Mfg Co,* 363 US 564; 80 S Ct 1343; 4 L Ed 2d 1403 (1960), and *United Steelworkers of America v Enterprise Wheel & Car Co,* 363 US 593; 80 S Ct 1358; 4 L Ed 2d 1424 (1960), (hereinafter referred to as the *Steelworkers Trilogy).*
"Although arbitration is a matter of mutual agreement between the parties, and they may choose to exclude certain areas of contention from the arbitration process, the standard set by the Court for finding a dispute non-arbitrable is a strict one: There must be

either an 'express provision excluding a particular grievance from arbitration' or 'the most forceful evidence of a purpose to exclude the claim from arbitration.' *Id.,* at 585; 80 S Ct at 1354. Here, there is no such 'express provision'. Whether or not a particular dispute is *prima facie* covered by the agreement's arbitration procedure is a question for the court to decide, see *John Wiley & Sons v Livingstone,* 376 US 543, 546–547; 84 S Ct 909; 11 L Ed 2d 898 (1964), and *Local Freight Drivers Local 208 v Braswell Motor Freight Lines, Inc,* 422 F2d 109, 112 (CA 9, 1970). The issue is therefore a simple one: is there forceful evidence of a purpose to exclude these grievances from arbitration so that the heavy presumption in favor of arbitration is overcome? We hold that there is not."

In the instant case there was no express provision in the contract excluding a change in the pension plan to arbitration, and there is no forceful evidence present herein of a purpose to exclude the subject claim from arbitration. We find further light on the subject in the case of *National Labor Relations Board v Strong,* 393 US 357; 89 S Ct 541; 21 L Ed 2d 546 (1969), wherein a labor contract was negotiated in behalf of an employer, who later refused to sign the contract and to put it into effect. Unfair labor charges were presented to the National Labor Relations Board (hereinafter called NLRB). The NLRB found that the employer violated § 8(a)(5), NLRA and ordered it to sign the contract. It also directed the employer to pay the fringe benefits, payable under the contract had the employer signed it.

The 9th Circuit Court of Appeals ordered the enforcement of the board's order, except as it applied to the payment of fringe benefits. It regarded that portion of the order as a direction of the employer to carry out the provisions of the contract. This, the Court said, is beyond the power

of the NLRB. The Supreme Court reversed this finding, stating in part at 393 US 364; 89 S Ct at 546; 21 L Ed 2d at 549-550:

*"Arbitrators and courts are still the principal sources of contract interpretation, but the Board may proscribe conduct which is an unfair labor practice even though it is also a breach of contract remediable as such by arbitration and in the courts."* (Emphasis supplied.)

The employer in *Strong* urged that the NLRB, in ordering the payment of fringe benefits reserved in the contract, was thereby inserting itself into the enforcement of the collective bargaining agreement, contrary to the policy of the NLRA. The Court on this subject stated at 393 US 360-361; 89 S Ct at 544-545; 21 L Ed 2d 549-550, as follows:

"The challenge of the employer, in brief, is that ordering the payment of fringe benefits reserved in the contract inserts the Board into the enforcement of the collective bargaining agreement, contrary to the policy and scheme of the statute. Admittedly, the Board has no plenary authority to administer and enforce collective bargaining contracts. Those agreements are normally enforced as agreed upon by the parties, usually through grievance and arbitration procedures, and ultimately by the courts. But the business of the Board, among other things, is to adjudicate and remedy unfair labor practices. Its authority to do so is not 'affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise * * * ' § 10(a), 61 Stat 146, 29 USC § 160(a). Hence, it has been made clear that in some circumstances the authority of the Board and the law of the contract are overlapping, concurrent regimes, neither preempting the other. *NLRB v C & C Plywood Corp,* 385 US 421; 87 S Ct 559; 17 L Ed 2d 486 (1967); *Carey v Westinghouse Electric Corp,* 375 US 261, 268; 84 S Ct 401; 11 L Ed 2d 320, 326 (1964); *Smith v Evening News Assn,* 371 US 195, 197-198; 83 S Ct 267; 9 L Ed 2d 246,

249–250 (1962); *Teamsters Local 174 v Lucas Flour Co,* 369 US 95, 101, n 9; 82 S Ct 571; 7 L Ed 2d 593, 597 (1962). Arbitrators and courts are still the principal sources of contract interpretation, but the Board may proscribe conduct which is an unfair labor practice even though it is also a breach of contract remediable as such by arbitration and in the courts. *Smith v Evening News Assn, [supra].* It may also, if necessary to adjudicate an unfair labor practice, interpret and give effect to the terms of a collective bargaining contract. *NLRB v C & C Plywood Corp, [supra]."* (Footnotes omitted.)

In the instant case the city argues that MERC exceeded its authority and usurped a judicial function when it ordered the city to submit the dispute to arbitration. We rule that MERC acted within its statutory authority. It determined in reference to the contract that the grievance was by the terms thereof, arguably arbitrable.

It did not make or attempt to make a judicial determination with respect to whether the dispute was arbitrable. This matter under the ruling is left to the arbitrator to determine. We follow the Federal cases that rule that the NLRB, MERC, and the courts have concurrent jurisdiction to hear such labor disputes based on contract. We rule that the MERC was a proper forum to hear the dispute and did not exceed its authority in ordering the matter submitted to arbitration as provided for in the collective bargaining agreement.

### III

Does the MERC have the authority to compel the city to submit to an arbitration proceeding which could result in an order requiring the city to violate its existing city charter?

We do not believe that such an arbitration

proceeding in the instant case would result in requiring the city officials to violate the city charter. Such arbitration could result, at the most, in restoring the conditions existing at the time the contract was entered into. Those conditions had been in effect for more than 20 years in determining the pension and retirement benefits to pay the firemen members of the plaintiff union.

*Arguendo,* a city charter's provisions for paying pension and retirement benefits to its employees cannot prevent the setting of such benefits through collective bargaining, between a city and its employees. *Detroit Police Officers Association, supra.*

Affirmed. Costs to plaintiff.